Harry B. DAVIS, Plaintiff in Error,

v.

NATIONAL BANK OF TULSA, Executor of the Estate of Joseph D. Davis, Deceased, Defendant in Error.

Zelda D. DICK, Plaintiff in Error,

v.

NATIONAL BANK OF TULSA, Executor of the Estate of Joseph D. Davis, Deceased, Defendant in Error.

Bessie Davis GOODALL, Plaintiff in Error,

v.

NATIONAL BANK OF TULSA, Executor of the Estate of Joseph D. Davis, Deceased, Defendant in Error.

Tybie Davis SATIN, Plaintiff in Error,

v.

NATIONAL BANK OF TULSA, Executor of the Estate of Joseph D. Davis, Deceased, Defendant in Error.

Yetra Rhae GOLDBERG, Plaintiff in Error,

v.

NATIONAL BANK OF TULSA, Executor of the Estate of Joseph D. Davis, Deceased, Defendant in Error.

Nos. 38937, 38943, 38944, 38946, 38947.

Supreme Court of Oklahoma.

June 21, 1960.

E. D. Brewer, Tulsa, for plaintiff in error Harry B. Davis.

Ungerman, Grabel, Ungerman, Leiter & Unruh, Tulsa, for plaintiffs in error Zelda D. Dick, Bessie Davis Goodall, Tybie Davis Satin and Yetra Rhae Goldberg.

C. H. Rosenstein, of Rosenstein, Mesirow & Fist, Tulsa, M. H. Silverman, Louis Levy, Tulsa, of counsel, for defendant in error National Bank of Tulsa, executor of the estate of Joseph D. Davis, deceased.

DAVISON, Chief Justice.

The above styled and numbered appeals upon application of the parties were by order of this court consolidated and will be disposed of by this decision.

These are appeals on the original records. The plaintiffs in error are the son and daughters of Joseph D. Davis, now deceased. They commenced separate actions in the lower court against the defendant in error. The actions sought to establish gifts and trusts in connection therewith by Joseph D. Davis, during his lifetime, to and in favor of the respective plaintiffs in error and for an accounting thereof. Defendant in error answered denying the gifts and trusts and alleged the actions were barred by limitations. Except as hereinafter described the plaintiffs in error will be referred to by their given names, Joseph D. Davis as "deceased" and the defendant in error as "executor".

The actions were consolidated for trial in the lower court. At the conclusion thereof the trial court found that the evidence failed to establish a trust with regard to proceeds of sale of certain shares of stock, or a trust with regard to certain salary credits appearing on the books of deceased in favor of Harry, but rather shows accounts payable, recovery thereon being barred by limitations. Judgment was rendered for the executor.

Appeals were perfected from the judgment. Plaintiffs in error present their contentions under several headings, but they may be grouped under the single proposition that the judgment is contrary to the law

and the evidence, and will be so considered by the court.

The record reflects that deceased died testate in January, 1957. Prior thereto and in 1920, as reflected by the records of Magna Oil & Refining Company, the deceased was the owner of not less than 100,-000 shares of the stock of that company. In June of that year the records of Magna and of the transfer agent show that at the direction of deceased, 80,000 shares of this stock was reissued with 20,000 shares each to Harry (age 12), Bessie (age 9), Tybie (age 6) and Zelda (age 1). Yetra was not yet born.

In 1923 deceased exchanged the Magna stock standing in the names of the four named children for stock of Tidal Osage Oil Company on the basis of 7 shares of Magna for 1 share of Tidal. The record does not reflect that any of the stock certificates were delivered to the children. Between 1926 and 1929 deceased sold the Tidal stock and deposited the proceeds in bank accounts which he set up for the respective four named children in 1926 and 1927. Each bank account was subject to signature withdrawal with the child's name "by Joseph D. Davis". These bank accounts were closed by deceased at various dates from 1929 to 1932 and the withdrawn funds mingled with deceased's own funds.

Beginning January 1, 1927, deceased set up separate account sheets for Harry, Bessie, Tybie and Zelda, whose ages were then approximately 18, 15, 13 and 8 years, respectively. The opening credit to each of these parties represents proceeds of sale of stock of Tidal Osage Oil Company. Succeeding entries purport to represent a statement of credits and debits in the account between deceased and each of the named children.

Yetra was born December 12, 1924. This was subsequent to the original Magna and Tidal stock transactions. No bank account was opened in her name. However, on December 31, 1929, deceased charged each of the accounts of Bessie, Tybie and Zelda with $15,000. With the resulting $45,000

deceased set up an account sheet with Yetra with ensuing debits and a few credits.

After the initial suit was filed in the lower court a firm of certified public accountants made an audit and check of the books and records of deceased. Apparently this was deemed necessary because of the dearth of descriptive notations upon the account sheets as to the charges shown thereon and the recipients of the funds represented thereby.

The audit of Harry's account reflects additional credits totaling $35,500 for salary for the period 1936 to 1945; that no entries were made after 1952 and that there was a credit balance of $20,371.26. The audit of the accounts of Bessie, Tybie, Zelda and Yetra reflects the same were balanced out and no entries were made after 1949, 1951, 1950 and 1951, respectively. In each instance a final *credit* was entered in a sufficient amount to terminate the account. The accounts of all five children over the years reflects numerous charges were made for funds paid to and for the benefit of the children and likewise for large and substantial amounts to and for the benefit of deceased and Celia, wife of deceased.

The accountants also prepared an "Account as Restated" in each instance wherein all charges for amounts to deceased and Celia and other amounts not traceable to the children were withdrawn. As to the accounts of Bessie, Tybie and Zelda this procedure was enlarged to withdraw the $15,000 charged to each account and used to set up the $45,000 credit in favor of Yetra. The "Account as Restated" reflects a credit balance to each of the children as follows: Harry $60,331.67, Bessie $16,860.13, Tybie $15,388.17, Zelda $21,539.-18 and Yetra $10,179.50. It is contended by plaintiffs in error that these figures are the minimum amounts which they are entitled to recover.

It is the attitude of this court that these "Accounts as Restated" are only a recomputation of the accounts. They do not amount to proof of wrongful charges by de-

ceased against the accounts. The correctness thereof depends upon the final determination of the issues.

Various tax records and trial balances of deceased reflect the stock transactions. Financial statements of deceased listed the plaintiffs in error and the amounts reflected by the account sheets under "Liabilities". The records make no mention of any account being kept by deceased as "Trustee". Testimony of a witness who had worked as a bookkeeper for deceased was that deceased instructed that the amounts be listed as liabilities; that if he showed this as a liability "I can borrow more money" from he bank, and "this is kinda like a note or account payable, I am taking care of that money for the children until they can be able to use it"; that when questioned about charges on the accounts for deceased's or his wife's use deceased stated "it was just bookkeeping and he wanted it entered that way". Another witness who performed accounting work for deceased testified deceased stated he was charging first one account and then another with family expenses to more or less keep them on an even basis and that information regarding the accounts should not be divulged to his children.

Plaintiffs in error did not testify except that Harry testified he never authorized or consented to charges against the balances. There was no testimony as to plaintiffs in error exercising any control or power over their accounts or the funds allegedly represented thereby.

We will first consider the proposition of whether there was a gift inter vivos by deceased to one or more of his children. At the time of the alleged gifts the donees were all minors of approximately one to twelve years of age. There is no evidence of delivery of the stock certificates to the alleged donees or to anyone in their behalf. The record reflects or leads to the inescapable conclusion that deceased at all times retained exclusive possession and control of them and the proceeds of sales thereof for many years. It is urged however that in speaking of the accounts the deceased called the accounts "the children's money".

In Sands v. Dildine, 175 Okl. 520, 54 P.2d 171, this court stated in the first and third syllabus by the court as follows:

"A gift cannot be established by proof of declaration of the donor that she had given the property to the claimant, in the absence of actual delivery; and the fact of delivery must be shown by other evidence than such declaration."

"After the death of an alleged donor, in order to establish a gift inter vivos, the evidence must be clear, explicit, and convincing in support of every element necessary to constitute a valid gift."

A case involving some similar facts and containing statements of law and conclusions applicable to the instant appeals is our decision in Frazier v. Oklahoma Gas & Electric Co., 178 Okl. 512, 63 P.2d 11, 12, wherein we stated in the third syllabus by the court as follows:

"A stock certificate is but prima facie evidence of ownership in the person to whom issued, and is not conclusive and the facts as to the true ownership may be shown, unless estoppel prevents."

and at page 13 of the Pacific Reporter as follows:

"The general rule is that to constitute a valid gift inter vivos there must be a donor competent to make it; freedom of will on his part; an intention on his part to make it; a donee capable of taking the gift; the gift must be complete, and nothing left undone; the property must be delivered by the donor, and accepted by the donee; the gift must go into immediate and absolute effect; the gift must be gratuitous; and the gift must be irrevocable.

\* \* \* \* \* \*

"In the case of In re Kaufmann's Estate, 281 Pa. 519, 127 A. 133, 137, it is said:

" ' "To make a valid gift inter vivos there must be a clear, satisfactory, and unmistakable intention of the giver to part with and surrender dominion over the subject of the gift with an intention to invest the donee with the right of disposition beyond recall, accompanied by an irrevocable delivery." Packer v. Clemson, 269 Pa. 1, 3, 112 A. 107.

" 'The absolute control must be vested in the donee (Maxler v. Hawk, 233 Pa. 316, 82 A. 251, Ann.Cas.1913B, 559; Ashman's Estate, 223 Pa. 543, 72 A. 899), and if all dominion is not divested, the proposed gift is incomplete (Walsh's Estate, 122 Pa. 177, 15 A. 470, 1 L.R.A. 535, 9 Am.St.Rep. 83) * * *.' "

and at page 15 of 63 P.2d as follows:

" * * * It is elementary that a gift cannot be made to take effect in possession in futuro. Such a transaction amounts only to a promise to make a gift, and is nudum pactum. Young v. Young, 80 N.Y. 422, 36 Am.Rep. 634. It is evident that the parents intended to retain absolute control over the stock, at least during the minority of the children, and did not intend immediately to divest themselves of dominion over it. The fact that the stock was registered upon the books of the corporation in the names of the plaintiffs, in the light of all the facts in this case, is not sufficient to establish a completed gift. * * *"

In Weil v. Commissioner of Internal Revenue, 5 Cir., 1936, 82 F.2d 561, 562, certiorari denied 299 U.S. 552, 57 S.Ct. 14, 81 L.Ed. 406, Weil contended that he had made a gift of stock to his minor children by placing the certificates in envelopes bearing severally the names and placing them in his safety deposit box. Notation of this was made in a book which showed the stock owned by his children. Later he directed the sale of the stock for his children and this was done and the amounts credited to them on the broker's accounts. Weil then endorsed the certificates and sent them to the broker for delivery against the sale. Weil never withdrew any of the proceeds for his own use. The question was whether the tax on the profit from the sale should be taxed to the children or to Weil. The opinion states:

"We think the controlling fact is that Weil proposed all the time to sell the stock and kept control of it to do so. He was not the guardian of the children, and it is conceded that under the law of Alabama he could not sell the property of his minor children. It is plain that he intended to give his children the benefit of the stock, and perhaps went to great pains to make it appear that he had done so before the profit was realized which would be taxed in solido if his, but in separate parts and less severely if his children's; but all the time he intended to and did maintain dominion and control over the stock so as to sell it. Prior to the several sales, the certificates sold never passed out of his custody into the control of any other person; they were never indorsed to the children or put in their names, nor was any writing signed and delivered by him purporting to convey them. This retention of control for the purpose of exercising dominion over them by sale is inconsistent with a present absolute gift, the legal result of which would have been to prevent a sale. * * * Whether a father may deal wholly with himself for his child without writing, without co-operation of any third person who represents the child, without doing what is ordinarily done to transfer this kind of property and without parting with control over the certificate, we greatly doubt. Generally a donor must go as far as the nature of the property and the circumstances reasonably permit in parting with dominion and making the gift irrevocable. * * * If the donor intends to give, and even goes so far as to transfer stock on the books of the company, but intends first

to do something else and retains control of the transferred stock for that purpose, there is not completed gift. Southern Industrial Institute v. Marsh (C.C.A.) 15 F.2d 347. * * *"

■ In the instant appeals the deceased retained possession, control and dominion over the stock and the proceeds of the sale thereof. There was never a completed gift. The most that may be said of the facts and circumstances is that deceased evidenced an intent to make a gift in the future.

■ We will next consider the contentions of plaintiffs in error that the acts of deceased and the circumstances were effective to create a trust in their favor. It is stated these were express trusts. Some authorities cited in support of this contention involve resulting and constructive trusts. These are trusts created by operation of law. The facts and circumstances clearly do not establish either a resulting or a constructive trust.

■ The foundation of a resulting trust is consideration. See 54 Am.Jur., Trusts, Sec. 194; Childers v. Breese, 202 Okl. 377, 213 P.2d 565. This is completely lacking as the record fails to show consideration of any kind or character to support a resulting trust.

■ A constructive trust is defined in 54 Am.Jur., Trusts, Sec. 218, as follows:

"A constructive trust, or as it is frequently called a trust ex maleficio, ex delicto, a trust de son tort, or an involuntarily or implied trust is by operation of law which arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy."

The decisions of this court are in accord with this statement. See Powell v. Chastain, Okl., 318 P.2d 859.

Deceased practiced no fraud, duress, abuse of confidence, et cetera, upon his minor children, preliminary to his acquisition of the stock. The children's claims are based upon a gift. It was within the discretion of the deceased to make or not make a gift of stock or money to them. We have held herein that the acts of deceased did not constitute a gift; that he never relinquished dominion and control of the property which was the subject of the alleged gift. He had the legal right not to complete the gift.

■ Furthermore we have held that the existence of a constructive trust will not be presumed. It must be established by clear, convincing and unequivocal evidence. Starnes v. Barker, Okl., 340 P.2d 463. The evidence in behalf of plaintiffs in error is not of this quality.

■ An express trust comes into being only upon execution of an intention to create it by the party having the legal and equitable control of the subject matter of the trust. See Childers v. Breese, supra. There must be intention to create an express trust and manifestation thereof, and not to do something else, as to create a gift. See 54 Am.Jur., Trusts, Sec. 33.

There is no evidence of either intention or manifestation of intention to create an express trust. At no place in the books and records of deceased, nor in any conversation of deceased, were the subject transactions referred to as a "Trust". No fiduciary tax returns appear in the record. The suggestion of the accountant who performed services for deceased from 1941 to date of deceased's death that he establish trusts for the children met with no favorable response. No evidence shows that deceased contemplated the creation of an express trust.

■ The actions of plaintiffs in error are in legal effect an effort to convert an imperfect gift into a trust. This will not

be done unless the situation complied with all the essentials and requisites of a trust. See 54 Am.Jur., Trusts, Sec. 67.

In Weil v. Commissioner of Internal Revenue, supra, the decision states:

"There was here no valuable consideration and no basis for equity to construct a trust. If there was a trust, it must have been an express trust. The evidence to establish a voluntary express trust in personal property, must show a clear intention to create a trust. Equity will not make one where none has been clearly declared. A defective or imperfect gift will not be converted into a trust."

In 54 Am.Jur., Trusts, Section 67, it is stated:

" * * * The rule is well established that equity will not give effect to an imperfect gift by enforcing it as a trust merely because of the imperfection, since to do so would be to give effect to an intention never contemplated by the maker. * * *"

This rule of law is supported by our decision in Sauls v. Whitman, 171 Okl. 113, 42 P.2d 275, and by annotations in 123 A.L.R. 1335, and 92 A.L.R. 383.

There remains for determination the status of the salary items credited to the account of Harry for the period 1936 to 1945. What we have said and our decision herein as to the stock and proceeds of sale thereof applies with equal force to the salary credits. No trust was created by deceased for the benefit of Harry and this includes the salary credits. The credit balance in favor of Harry appearing on the account sheets of deceased was an account payable. Any action to recover same is barred by the three-year Statute of Limitation. 12 O.S.1951 (Amended 1953) § 95.

These are cases of equitable cognizance and this court has reviewed and weighed the evidence and finds the judgment of the lower court is not clearly against the weight of the evidence and

should be affirmed. Buck v. Caldwell, Okl., 340 P.2d 485.

Judgment affirmed.

WILLIAMS, V. C. J., and WELCH, JOHNSON, BLACKBIRD, JACKSON, IRWIN and BERRY, JJ.